# IN THE UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF ILLINOIS
# URBANA DIVISION

| | |
|---|---|
| BRUCE DICKSTEIN, | ) |
| | ) |
| Plaintiff, | ) |
| | ) Case No. 1:22-cv-01360-CSB-EIL |
| v. | ) |
| | ) |
| ANTHONY D. MALZONE, | ) |
| | ) JURY TRIAL DEMANDED |
| | ) |
| Defendant. | ) |

## DEFEDANT ANTHONY D. MALZONE'S RESPONSE
## IN OPPOSITION TO PLAINTIFF'S MOTION TO APPOINT A RECEIVER

Defendant, Anthony D. Malzone ("Defendant" or "Malzone"), by and through his counsel, for his response in opposition to the Motion To Appoint A Receiver and For Other Relief (the "Motion") filed by Plaintiff, Bruce Dickstein ("Plaintiff" or "Dickstein") states as follows:

Dated: February 23, 2023                         Respectfully submitted,


                                                 By: __/s/ Richard A. Saldinger_____
                                                     One of Defendant's Attorneys


Laurence M. Landsman (ARDC No. 6202411)
Richard A. Saldinger (ARDC No. 6209930)
Landsman Saldinger Carroll, PLLC
161 North Clark Street, Suite 1600
Chicago, IL 60601
(312) 291-4650
landsman@lsclegal.com
saldinger@lsclegal.com

**INTRODUCTION**

Rather than properly seeking the Court's permission to change the status quo and appoint a Receiver to manage the properties owned by the parties, Dickstein asks this Court to endorse his prior, unilateral and improper conduct *ex post facto*. Indeed, Dickstein, ***not the Partnership***, retained Wesley Realty Group, Inc. ("Wesley") in October 2022 to manage the properties without obtaining the necessary consent from his partner, Malzone. Dickstein, ***not the Partnership***, then directed Wesley's activities and instructed Wesley to ignore Malzone, who repeatedly told both Dickstein and Wesley that Wesley was acting without his authority and without knowing all of the relevant information concerning the tenants and the subject properties. Still further, the Motion relies on a series of mischaracterizations, half-truths and outright falsehoods. At bottom, Plaintiff has taken unilateral actions contrary to the terms of the parties' Partnership Agreement (the "Agreement") and the Illinois Uniform Partnership Act, 805 ILCS 206/401, et seq., and now asks this Court approve his previously undertaken illicit actions.

Moreover, Plaintiff fails to inform the Court that Malzone repeatedly advised Plaintiff that he was willing to agree to a third-party property manager with certain reasonable conditions concerning control, accountability and transparency. Dickstein, however, chose to ignore Malzone's efforts to seek a compromise. Wesley's blind allegiance to Plaintiff and its own improper conduct has placed the Partnership at risk and quickly demonstrates that Wesley cannot be the property manager, either Court-appointed or by agreement of the parties.

Without the necessary factual or legal basis, Plaintiff's Motion to appoint Wesley, or any other property manager, as a receiver should be denied. Defendant remains willing to cooperate with Plaintiff to hire a legitimate, unbiased third-party property manager so that, until the conclusion of this litigation, the operation of the Partnership can continue in a cooperative and

transparent manner without further dispute.  However, there is no basis for the Court to appoint a receiver, and under no circumstances should Wesley be the property manager.

## STATEMENT OF FACTS[1]

Plaintiff and Defendant are equal partners – 50/50 -- in the Partnership.  The parties entered into the Agreement on January 1, 2007.  See Exhibit A.  The Agreement provides that the parties are to share the net profits and net losses fifty-percent (50%) each.  See Ex. A, Article VI(A).  The Agreement also provides:

> Except as otherwise expressly provided herein, the management and control of the operations of the Partnership and the maintenance of the property of the Partnership shall rest exclusively with the Partners.

*Id*., Article IX.  Additionally, the Agreement provides:

> Each Partner shall be entitled to vote in proportion to his equity interest in the Partnership from time to time.  Such vote may be exercised by written or oral notification by a Partner to the other Partner.

*Id*., Article X.  Moreover, the Agreement sets forth:

> The Procedure for the operations of the Partnership shall be as follows:
>
> (A) The affairs of the Partnership shall be handled by the Partners.
> (B) The following shall require the vote and unanimous approval of all the Partners:
>     (1) the purchasing and developing of any real estate properties; and
>     (2) The amendment of this Partnership Agreement.

*Id*., Article XI.

As Plaintiff concedes, "Defendant historically has been the partner who has primarily handled collecting the rents from tenants and the Section 8 payments."  See Memo., p. 2.

---

[1] The "Background" section in Plaintiff's Memorandum and the Declarations submitted in support of the Memorandum contains many factual allegations that are half-truths, misleading and/or complete falsehoods. Defendant will not address all of those allegations at this time, but will provide the Court with a more complete and accurate factual background for the Court to consider in addressing the Motion. Defendant's failure to address certain allegations in the Memorandum is not a concession that such allegations are accurate.

Additionally, Defendant has always been the partner responsible for managing the Properties, leasing the Properties, ensuring necessary repairs to the Properties are performed, handling any questions or concerns of the tenants, and working with the Kankakee County Housing Authority (the "KCHA") with regard to Section 8 leasing. See Exhibit B, Declaration of Anthony D. Malzone at ¶ 16. Plaintiff concedes, as he must, that he expressed no concerns regarding Defendant's method of operating the Partnership from its inception in 2007 until September 2022 – a period covering nearly 16 years. See Memo, pp. 3-4; see also Ex. B, ¶ 43.

Based on a fundamental misunderstanding of the facts and baseless assumptions, Plaintiff made the decision in October 2022, without Defendant's consent, to retain Wesley as a third-party management company to act as property manager for the Properties. See Memo., p. 4. Pursuant to the Agreement and relevant law, Plaintiff did not have the legal authority to hire Wesley as a third-party property manager without Malzone's consent. Beyond being unauthorized, Plaintiff's unilateral decision to hire Wesley has endangered the Partnership in several ways, not the least of which is the fact that Wesley has served 5-day notices on the Partnership's tenants, including those who were not late in their rent payments, without knowing whether those tenants were delinquent in their rents. See Ex. B, ¶ 43-44.

Plaintiff repeatedly claims that Malzone has withheld information from him over the years. See Memo., p. 3. However, this suggestion is both misleading and disingenuous. First, as a joint owner of the bank account used for Partnership purposes, Plaintiff had direct access to all bank records regarding deposits and payments. Second, and even more importantly, *Plaintiff* is the party who actually had first-hand knowledge and control over all of the records evidencing the expenses associated with the operation and management of the Properties and the Partnership.

From the formation of the Partnership in January 2007 until approximately December

2020, Plaintiff was one of the owners of the David Bruce Auto Center (the "Auto Center"), a car dealership located in Bourbonnais, Illinois. See Ex. B, ¶ 32. Until his departure, the Auto Center, not Plaintiff, was paying the costs for the majority, if not all, of the expenses related to the operation and management of the Properties in two separate ways. *Id.,* ¶¶ 34-36. The Auto Center's comptroller, Rhonda Thomas, would receive the receipts for expenses relating to the Properties (e.g., invoices from contractors for repairs, etc.) submitted by Defendant. *Id.* Ms. Thomas would then process the payments from the *Auto Center's* bank account. *Id.* Additionally, Plaintiff, as an owner of the Auto Center, provided Defendant with an Auto Center credit card in Defendant's name that Defendant was authorized to use for expenses relating to the Properties. *Id.*[2] In turn, the Auto Center, not Plaintiff, would pay the credit card balances due for those charges. *Id.* Thus, Plaintiff, as an owner of the Auto Center, had full and direct access to all information regarding the expenses incurred by the Partnership that were paid by the Auto Center.

> Plaintiff also makes the following false and misleading allegations:
>
> Allegation: "Beginning in 2008, Plaintiff contributed additional capital to the Partnership when the Partnership's monthly proceeds were insufficient to cover its operating expenses." "Plaintiff would also advance [his personal funds] to pay the real estate taxes for certain Properties and make mortgage payments directly to the Bank of Bourbonnais." See Memo, p. 2.
>
> Response: From time to time, the Auto Center, *not Plaintiff*, paid certain expenses to third parties associated with operation and management of the Partnership. See Ex. B, ¶¶ 32-36.
>
> Allegation: "Defendant has made no capital contributions despite requests from Plaintiff to make such contributions." See Memo., p. 3.

---

[2] The "advances" Plaintiff allegedly made on behalf of the Partnership are, in fact, payments that were undoubtedly made by the Auto Center. Prior to Plaintiff filing his Motion to Appoint Receiver, Defendant served written discovery requests on Plaintiff that sought, in part, to obtain documents and information regarding the basis of Plaintiff's claim that he personally contributed $1,612,717.48 in advancements to pay for Partnership expenses. To date, Plaintiff has not produced any evidence that he was ultimately responsible for and actually paid the expenses advanced by the Auto Center.

Response: Plaintiff never requested any "capital contributions" from Defendant until mid-September 2022. See Ex. B, ¶ 40. Additionally, as further discussed below, Plaintiff had no obligation to make any capital contribution to the Partnership.

Allegation: "In or around June 2022, Plaintiff noticed that the Partnership was regularly in need of additional capital in order to cover the mortgage, taxes, and other operating expenses of the Partnership…." See Memo., p. 3.

Response: According to Plaintiff, he/the Auto Center was "advancing" more than $1.6 million to "finance the Partnership's real estate operations" "over the course of the Partnership." Id. Thus, Plaintiff could not have suddenly become aware in June 2022 that the Partnership sometimes needed additional capital.

Allegation: "Shortly [after mid-September 2022], Plaintiff learned that Defendant informed the [Bank] that Defendant would no longer be depositing any funds into the Partnership Account." See Memo., p. 4.

Response: At that time, the Bank had stopped providing Defendant with receipts for rental payment deposits and also refused to honor checks written by Defendant out of the Partnership Account. See, Ex. B ¶ 26.

Allegation: "After Wesley began managing the Properties, Plaintiff discovered that one of the [Properties] was purchased with funds Plaintiff contributed to the Partnership, however the property was titled in Defendant's name only." See Memo., p. 5.

Response: Plaintiff knows, and has been repeatedly told, that this was an inadvertent mistake, and Defendant has repeatedly agreed in writing to execute the appropriate Quit Claim Deed so that the subject property is titled in the names of both of the partners. See, Ex. B, ¶ 8; see also Memo., Ex. 4 at pp. 10-12.

Allegation: "Plaintiff advised that it would instruct Wesley to rescind or revoke the Five-Day Notices if Defendant would provide a list of the amount he personally received by each tenant so that *Wesley* could determine if the tenants were in compliance with their lease…." See Memo., p. 6.

Response: Wesley was not authorized to make the determination whether tenants were in compliance with their lease. Nonetheless, Defendant agreed to provide Plaintiff with the requested accounting but requested a similar accounting from Plaintiff to support his alleged capital contributions in excess of $1.6 million. Plaintiff ignored Defendant's efforts to reach a compromise. See Memo., Ex. 4 at pp. 10-12.

**ARGUMENT**

Appointment of a receiver is an extraordinary remedy. *JP Morgan Chase Bank, N.A. v. Heritage Nursing Care, Inc.*, 2007 U.S. Dist. LEXIS 65904 (N.D. Ill. Sept. 6, 2007). The Court should exercise its discretion to appoint one with care and caution, and it is the burden of the party seeking the appointment of a receiver to establish that the appointment is warranted. *Id.*

Despite this high burden, Plaintiff comes to this Court based on his unsupported "beliefs" rather than actual, uncontroverted facts that would warrant the appointment of a receiver. Even worse, Plaintiff himself created the present chaos with the management of the Properties by unilaterally hiring Wesley without Malzone's consent and allowing Wesley to inform the tenants that it, rather than Malzone, is the new property manager. It defies logic that Plaintiff can take actions that cause the chaos and disruption in the management of the Properties and then come to this Court and ask the Court to appoint *Plaintiff's* improperly chosen company to act as a receiver.

Despite Defendant's efforts to exchange information and reach a compromise, Plaintiff asks the Court to appoint Wesley as the receiver based on the following five criteria: (i) fraudulent conduct by the opposing party; (ii) imminent danger of the property being lost, concealed, injured, diminished in value, or squandered; (iii) inadequacy of available legal remedies; (iv) the probability that harm to the moving party would be greater than injury to the opposing party; and (v) the moving party's probable success in the action and the possibility of irreparable injury to his interests in the property. See Memo., p. 8, citing *JP Morgan Chase Bank N.A. v. Heritage Nursing Care, Inc.*, 2007 WL 2608827 at *9 (N.D. Ill. Sept. 6, 2007).

Plaintiff does not, and cannot, satisfy these elements for appointment of a receiver.

**I.     Defendant Fails to Allege Fraud in the Complaint.**

While conceding that he has not asserted a claim for fraud, Plaintiff contends that the

"evidence suggests" that Defendant *may* have engaged in some type of fraudulent conduct. See Memo., pp. 9-10. In reality, Plaintiff's purported evidence of fraud reflects nothing more than Plaintiff's fundamental misunderstanding of the actual facts.

### (A) Defendant has not impermissibly withdrawn funds from the Partnership's checking account at Bank of Bourbonnais.

Plaintiff alleges on "information and belief" that Defendant engaged in fraud by "withdrawing funds from the Partnership Account for his own personal benefit without the knowledge and consent of Plaintiff." *Id.*, p. 10. More specifically, Plaintiff alleges that Malzone improperly retained a portion of the payments made by the KCHA for several of the Partnership's properties pursuant to Section 8 of the Housing Act of 1937. See Memo., p. 2. This accusation is demonstrably false.

Defendant acknowledges that the KCHA made its Section 8 payments for the Properties on approximately a monthly basis by a single check payable to Defendant personally. See Ex. B, ¶ 17. In his declaration, Plaintiff claims he does not know the reason why Section 8 checks were made payable to Malzone rather than to the Partnership. See Memo. at Ex. 1, ¶ 17. However, Plaintiff knows or should know that the KCHA wrote its checks payable to Defendant rather than the Partnership because the Partnership *did not* have a bank account at the Bank of Bourbonnais in its name. See Ex. B, ¶ 25. Rather, the bank account used by the Partnership is a joint checking account held in the individual names of Plaintiff and Defendant. *Id*. Thus, the KCHA necessarily made checks payable to Defendant, and Defendant deposited these checks in the joint account at Bank of Bourbonnais that was used for Partnership purposes. See Ex. B, ¶ 18.[3]

---

[3] Notably, Plaintiff himself recently completed a form directing the KCHA to make the checks payable to "Bruce Dickstein and Anthony Malzone" and not payable to the "Partnership." See Exhibit __ attached hereto.

7

Plaintiff also "suggests" that Defendant engaged in fraud by "taking a portion of the Section 8 payments in cash rather than depositing the entire check in the Partnership Account." See Memo. at Ex. 1, ¶ 31. However, the KCHA's single monthly check included Section 8 subsidy payments for one property that <u>did not belong to the Partnership</u>. See Ex. B, ¶ 19. Rather, that property (located at 447 North Birch in Manteno, Illinois) belonged to Defendant's daughter, Sophia Malzone. Id.[4] Because Defendant was listed a co-signer on his daughter's property, the KCHA chose to send Defendant just one check a month that covered the subsidy payments to the Properties as well as Defendant's daughter's property. See Ex. B, ¶¶ 18-20.[5] When Defendant received the monthly KCHA check he would deposit it into the joint bank account but retain that portion of the check belonging to his daughter's property. Id. As necessary, Defendant would also use a portion of the KCHA checks to pay for necessary repairs for the Properties. Id., ¶ 21. Defendant did not commit fraud and, notably, Plaintiff never asked Defendant about these allegedly improper withdrawals before hiring Wesley and filing his Complaint. Id. ¶ 22.

**(B)  Plaintiff's conduct and the Bank's actions directly led to Defendant's inability to continue to deposit rent payments into the joint bank account.**

Plaintiff again tells less than half of the true story when he blindly asserts that Malzone is

---

[4] In or around October 2022, Plaintiff apparently convinced the KCHA to send the Section 8 checks to him instead of Defendant. At that time, the KCHA began to separate Defendant's daughter's payment from the rest of the Section 8 subsidy payments. See Ex. B, ¶ 24.

[5] The property owned by Defendant's daughter is ***not*** the same property that Plaintiff complains was a Partnership Property inadvertently placed in Defendant's name. See Memo., p. 5; Ex. B, ¶ 8. When Plaintiff's attorney pointed out in an email to Defendant's attorney that a property which belonged to the Partnership was placed in Defendant's name, Defendant responded that he was not aware of that issue and immediately agreed to execute a Quit Claim Deed to transfer to property to the Partnership. Id. It has not been done yet because the Quit Claim Deed prepared by Plaintiff identified Wesley as receiving real estate tax bills, which Defendant did not agree to. Defendant advised Plaintiff of the need to remove Wesley from the deed and reaffirmed his agreement to deed the property to the Partnership. See, Memo., Ex. 4, pp. 10-12. Plaintiff failed to provide a revised Quit Claim Deed, indicating his refusal to remove Wesley.

committing fraud by not depositing certain rent payments into the parties' joint bank account. See Memo., p. 10. Indeed, it is what Plaintiff does ***not*** tell the Court that readily explains Defendant's actions, none of which are fraudulent.

At or around the same time that Plaintiff unilaterally and improperly hired Wesley to be the property manager, he also raised his unfounded concerns about Malzone with the Bank. Shortly after those conversations, which did not include Defendant, the Bank refused to provide Defendant with receipts reflecting the rent deposits made by the tenants and by Defendant himself into the joint bank account. See Ex. B, ¶ 26. Historically, the Bank would necessarily provide such receipts to Malzone so that he could accurately keep a record of the rental payments being made by the tenants of the Properties. *Id.* Without this critical information, Defendant could not properly manage the Properties – a responsibility he had been handling without any questions or interference from Plaintiff for more than 15 years. *Id.,* ¶ 43. Still worse, the Bank (undoubtedly at Plaintiff's direction) stopped honoring checks written on the joint account by Defendant in favor of third-party vendors. *Id.*, ¶ 27. This, too, was untenable because Defendant continues to be an equal co-owner of the joint bank account as well as a fifty percent owner of the Partnership. Defendant is informed and believes that Plaintiff was responsible for the Bank's actions in this regard. *Id*.

At bottom, ***Plaintiff's*** conduct placed Malzone, and by extension the Partnership, in a position where Malzone could not do his job without cooperation from the Bank. Plaintiff's unilateral and illicit actions based on unfounded "beliefs" cannot possibly serve as a foundation to establish that Malzone is guilty of fraud.

### (C)     Acceptance of rent payments in cash is not evidence of fraud.

Plaintiff attaches a January 27, 2023, letter purportedly written by a tenant claiming that

Defendant requested she pay her rent in cash. See Memo. at Ex. 1(F). Again, Plaintiff's accusations are misleading. This tenant began renting the property from the Partnership on October 1, 2022, which is the very time Defendant could no longer deposit rent payments into the joint bank account because the Bank refused to provide Defendant with deposit receipts. See Ex. B, ¶ 26. As a result of Plaintiff's unauthorized actions, Defendant was left in an untenable situation, as he was attempting to manage the Properties without cooperation from the Bank and while Wesley's unauthorized actions of attempting to manage the Properties created conflict and confusion by the tenants who Wesley had contacted.

As a result, Malzone could no longer deposit rental payments into the joint bank account because he would not have proper records of deposits and he did not have access to the funds to pay for needed repairs to the Properties. *Id.,* ¶¶ 29-30. Indeed, Malzone was left with a "Hobson's Choice," where he was unwilling to turn over the operation of the Partnership to Wesley, so the only viable way he could continue to manage the Properties was to have certain tenants make payments in cash. *Id.* He used those cash payments to pay for the repairs he ordered for the various Properties, and can account for the same. *Id.* At bottom, Defendant did not commit fraud by accepting cash rental payments from certain tenants.

## II.     The Properties Are Not In Any Imminent Danger.

Plaintiff contends that "Defendant's withdrawals of cash from the Partnership Account and failure to deposit cash rents into the Partnership Account have resulted in insufficient funds to cover the monthly mortgage payments. Such actions create an imminent danger that the Bank of Bourbonnais may accelerate the loan and risk foreclosure of the Properties." See Memo., p. 10. This contention is also demonstrably false.

As demonstrated *supra*, Plaintiff's accusations of improprieties by Defendant are false.

However, and in any event, Plaintiff knows there is no danger, imminent or otherwise, that the Bank intends to accelerate the loan. Specifically, on or about February 1, 2023 – and **before** Plaintiff filed his Motion -- the Bank contacted the parties and offered to refinance the loan for the Properties by keeping the same period for repayment but extending the amortization schedule. *Id.,* ¶ 42. Both parties agreed to the re-financing and the transaction closed on or about February 13, 2023. *Id.* The refinance dramatically reduces the monthly mortgage payment obligation from approximately $34,000 to $18,000. *Id.* Accordingly, the risk that the Bank intends to accelerate the loan does not exist.

After Defendant managed the Properties for more than fifteen years (a period where Plaintiff does not suggest he had any complaints about Defendant's management skills), Plaintiff now baldly concludes that "Defendant is unfit and incapable of managing the Properties." Plaintiff's lone support for this conclusion are his unfounded allegations of fraud and a single complaint by a single tenant who rented one of the Properties at the beginning of October 2022 and is unfortunately caught in the middle of a dispute created by Plaintiff's actions. See Memo., pp. 10-11 and at Ex. 1 ¶¶ 45-48, 61. Managing forty-seven (47) properties will necessarily lead to tenant and repair issues that need to be addressed, and it is expected that the occasional tenant will have a complaint. Nonetheless, Defendant has managed the collection of Properties for nearly 16 years, and Plaintiff has identified no prior complaints until September 2022. *Id.,* ¶ 43.

    **III.    Plaintiff Faces No Meaningful Probability of Harm.**

Plaintiff argues that the "risk of Defendant's ongoing misappropriation and breach of fiduciary duties owed to the Partnership, [the] Properties, and its tenants poses a greater risk of injury than the Court's appointment of a third-party to oversee the management of the Properties." See Memo., p. 12. As discussed above, there has been no misappropriation by Defendant, and he

has breached no fiduciary duty.  By contrast, Plaintiff's unilateral hiring of a third-party property manager blatantly violated the Agreement and has resulted in confusion and distrust amongst the tenants imperiled the Partnership.  Indeed, Wesley has ignored Malzone's attempts to provide it with a complete and accurate picture of the status of the properties, and has improperly served five-day notices on tenants who were not delinquent in their rent obligations.  See Ex. B, ¶ 44.  Even worse, Wesley served such five-day notices with no intention whatsoever of taking any action against those tenants.  Such scare tactics pose a likelihood of injuring the Partnership through tenants vacating their homes and/or filing their own claims against the Partnership.

### IV. Plaintiff Does Not Have a Reasonable Likelihood of Success In the Action.

Plaintiff argues "that Defendant has failed to contribute his pro rata share of funds to the Partnership in breach of Article V of the Partnership Agreement."  See Memo., p. 13.  This contention is not only premature, but also false for several reasons.[6]

First, Plaintiff's own allegations contradict each other.  On the one hand, Plaintiff argues that, "[b]eginning in 2008, Plaintiff contributed additional capital to the Partnership when the Partnership's monthly proceeds were insufficient to cover its operating expenses."  See Memo., p. 2.  He then contends that he "has advanced more than $1,612,717.48 of his personal funds to finance the Partnership's real estate operations."  Id., p. 3.[7]  Plaintiff then contradicts himself by stating that it was not until June 2022 that he "noticed that the Partnership was regularly in need

---

[6] Plaintiff's Motion is not the proper forum to decide if Defendant was required to make any capital contributions to the Partnership.  Defendant only responds to refute Plaintiff's accusations and because these issues will have to be addressed in detail by the parties and the Court at a later date.  Clearly, there are significant questions of fact and law showing that Defendant had no obligation to make any capital contribution, and that Plaintiff's alleged payments of $1.6 million, which he has to date refused to detail, do not constitute capital contributions.

[7] Plaintiff's language in this regard is notable.  He states that he "advanced" funds rather than "contributed capital." He also states that these advances were "to finance the Partnership's real estate operations" and does not state that the funds "were contributed *to the Partnership*."  His choice of language is intentional because Plaintiff knows that these "advances" were not "contributed capital to the Partnership" as defined in Article V of the Agreement.

12

of additional capital in order to cover the mortgage, taxes and other operating expenses of the Properties, despite there being no major changes in rental occupancies." *Id*. These contradictory statements beg the question: Why did Plaintiff allegedly advance $1.6 million **before** he "first noticed" in June 2022 that the Partnership was regularly in need of additional capital?

Second, the parties executed the Agreement in January 2007. While the Agreement may suggest that both partners would make "capital contributions," the parties understood and agreed – as evidenced by their conduct for more than fifteen years – that Plaintiff would contribute any capital the Partnership needed, and Defendant would manage the Properties and operate the Partnership. See Ex. B, ¶¶ 31, 41. Indeed, Plaintiff never requested a capital contribution from Defendant before September 2022, which was shortly after Plaintiff lost the ability to have the Auto Center fund the payment of any necessary expenses for the Partnership. *Id.*, ¶¶ 40-41.

For Plaintiff to argue otherwise would also result in an extremely inequitable distribution of responsibility for a 50/50 partnership. Plaintiff admits that "Defendant historically has been the partner who has primarily handled collecting the rents from tenants and the Section 8 payments." See Memo., p. 2. According to Plaintiff's argument, Defendant was also required to contribute hundreds of thousands of dollars to the Partnership to match Plaintiff's (or the Auto Center's) advances **and** manage the Partnership's operations for all of the Properties. Clearly, that was not the parties' intent.

Third, even if the Court ultimately concludes that Plaintiff made capital contributions, Plaintiff waived any such requirement by Defendant by never seeking a capital contribution from Defendant for more than fifteen years. See *Pielet v. Hiffman*, 407 Ill. App. 3d 788, 798 (1st Dist. 2011) ("Waiver is the intentional relinquishment of a known right, and may be express or implied"). This is the type of implied waiver that arises "through conduct inconsistent with an

intent to enforce that right." *Id*.

Fourth, most if not all of the advances made to fund Partnership operations were made by the Auto Center, not Plaintiff. The Auto Center issued checks to vendors of the Partnership, and Defendant was given an Auto Center credit card to charge costs for repairs. To date, Plaintiff has failed to provide any evidence that he somehow reimbursed the Auto Center for the latter's payment of Partnership expenses. Article V of the Agreement specifically provides that a capital contribution is a contribution of "necessary capital *to the Partnership*." See Ex. A at Art. V. The Auto Center paying for Partnership expenses *is not* a contribution of capital by a Partner to the Partnership. Similarly, even if Plaintiff reimbursed the Auto Center, that does not constitute a contribution of capital "to the Partnership."

Finally, Plaintiff is not likely to succeed on the merits because he improperly engaged Wesley as the property manager without Defendant's consent. Article XI(A) of the Agreement provides that, "[t]he procedure for the operations of the Partnership shall be as follows. . .(A) The affairs of the Partnership shall be handled by the Partners." See Ex. A at Art. XI(A). In that regard, Section 401(j) of the Uniform Partnership Act, 805 ILCS 206/401(j), provides:

> A difference arising as to a matter in the ordinary course of business of a partnership may be decided by a majority of the partners. ***An act outside the ordinary course of business of a partnership. . .may be undertaken only with the consent of all of the partners.***

Plaintiff's attempt to hire Wesley was unauthorized and in violation of the Agreement and relevant statutory law. The use of an outside property management company is outside the "ordinary course of business" of the Partnership because in nearly 16 years of operation, the Partnership had never before hired a third-party manager. Thus, Defendant's consent was necessary to hire Wesley. Since Plaintiff and Defendant are 50/50 partners, Plaintiff did not even have the consent of a majority of the partners.

Accordingly, due to the significant questions of fact and law, Plaintiff cannot demonstrate a likelihood that he will succeed on the merits of his claims.

### V. Wesley Cannot Be The Receiver

If the Court decides to appoint a receiver, it cannot be Wesley. "A receiver is an officer of the court; he does not owe allegiance to the one who sought his appointment, but rather acts as a fiduciary on behalf of both parties." *JP Morgan Chase Bank*, *10. Plaintiff hired Wesley without even a written agreement to govern Wesley's conduct. Nevertheless, Wesley has already established its allegiance to Plaintiff to the detriment of both the Partnership and Defendant. Wesley served five-day notices on tenants without actually knowing whether or not they were delinquent in their rent payments. He also advised Defendant's attorneys that he had no intention of pursuing relief on the five-day notices, meaning they were an improper scare tactic. Indeed, when Malzone advised Wesley that the five-day notices were imprudently issued and should be revoked, it continued to serve additional notices on other tenants and ignored Malzone and his counsel. Wesley is far from impartial, and its conduct will likely lead to claims being filed against it in these proceedings for tortious interference with the Agreement.

### **CONCLUSION**

For the foregoing reasons, Defendant requests that the Court deny Plaintiff's Motion.

**CERTIFICATE OF SERVICE**

    This is to certify that on February 23, 2023, I electronically filed the foregoing with the Clerk of the Court by using the CM-ECF system, which sends a notice of electronic filing to counsel of record.

                                                       __/s/ Richard A. Saldinger_____
                                                        Counsel for Defendant