# EXHIBIT B

IN THE UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
URBANA DIVISION

| | | |
|---|---|---|
| BRUCE DICKSTEIN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 1:22-cv-01360-CSB-EIL |
| v. | ) | |
| | ) | |
| ANTHONY D. MALZONE, | ) | |
| | ) | JURY TRIAL DEMANDED |
| | ) | |
| Defendant. | ) | |

### DECLARATION OF ANTHONY D. MALZONE
### PURSUANT TO 28 U.S.C. § 1746 IN OPPOSITION TO
### PLAINTIFF'S MOTION FOR APPOINTMENT OF A RECEIVER

I, Anthony D. Malzone, declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the following statements are true and correct with the sole exception of those statements that are qualified to be upon my knowledge, information and belief.

1. I have personal knowledge of the facts stated herein and, if called to testify, am competent to testify about the same.

2. I am a co-founder and general partner of a partnership organized under the laws of the State of Illinois and evidenced by a Partnership Agreement (the "Agreement") entered into as of the 1st day of January, 2007 (the "Partnership"). Bruce Dickstein ("Dickstein") is the other co-founder and general partner of the Partnership.

3. Dickstein and I are the sole general partners of the Partnership. There are no limited partners in the Partnership.

4. A true and correct copy of the Agreement is attached as Exhibit A to the

1

Declaration of Bruce Dickstein (the "Dickstein Declaration"). The Dickstein Declaration is filed as Exhibit 1 in support of Dickstein's Motion For Appointment Of A Receiver (the "Motion").

5. The Partnership's principal place of business has always been located at my home at 508 S. Poplar Circle in Manteno, Illinois.

6. In or around 2007, the Partnership began purchasing real estate properties in Kankakee County, Illinois.

7. Beginning in 2007, the Partnership purchased a total of approximately forty-seven (47) real estate properties (the "Properties"), mostly single-family homes, which the Partnership has rented to various tenants who have leased the Properties.

8. The Properties are titled in the names of "Bruce Dickstein and Anthony Malzone" except for one Property located at 6403 East Flora Street in Kankakee, Illinois. The Property located at 6403 East Flora Street in Kankakee, Illinois was mistakenly titled only in my name. Through my attorneys, I previously advised Dickstein that I agree to execute a proper Quit Claim Deed transferring ownership of this property to the Partnership.

9. To the best of my knowledge, information and belief, a list of the Properties currently owned by the Partnership and titled in the names of Dickstein and Malzone is attached to the Dickstein Declaration as Exhibit B.

10. Approximately nineteen (19) of the Properties are subject to Section 8 of the Housing Act of 1937 (42 U.S.C. § 1437f) ("Section 8").

11. Approximately thirty-four (34) of the Properties were purchased with financing

from the Bank of Bourbonnais, Illinois (the "Bank").

12. The financing described in paragraph 11 of this Declaration is a loan from the Bank in which Dickstein and I are co-borrowers (the "Loan"). The Loan is secured by approximately thirty-four (34) of the Properties.

13. The outstanding principal balance due on the Loan is approximately $1.7 million.

14. At the suggestion of the Bank of Bourbonnais, which holds the Loan on the Properties, the Partnership refinanced the Loan on or about February 13, 2023, to significantly lower the monthly payments from approximately $31,000 to approximately $18,000.

15. Dickstein and I also have a joint bank account at the Bank, which is held in the names "Bruce Dickstein and Anthony Malzone." This joint bank account is utilized to receive rental payments from the tenants of the Properties and is also used to pay expenses associated with the operation and management of the Properties. The joint bank account will be referred to herein as the "Bank Account."

16. From the very beginning of the Partnership, I have been the general partner primarily responsible for the management of the Properties. My responsibilities in that role have included, among other things: (i) collecting rental payments from the tenants; (ii) entering into lease agreements with tenants; (iii) arranging for and/or performing any necessary repairs for the Properties; (iv) communicating with the tenants; (v) receiving and depositing Section 8 contribution checks received from the Kankakee County Housing Authority (the "KCHA"); (vi) communicating with the KCHA regarding Section 8 housing-related questions; (vii) inspecting the Section 8 Properties with representatives

3

of the KCHA; (viii) hiring attorneys, when necessary, to handle any evictions of any of the tenants of the Properties; (ix) arranging for the payment of the sewer bills for all of the Properties; and (x) generally inspecting the Properties to make sure that the Properties are in good and habitable condition.

17. For those Properties that are subject to Section 8 housing, the KCHA contributes a portion of rental payments due for each of the Properties subject to Section 8 housing. The contributions from the KCHA for the Section 8 Properties would come in the form of a _single check_ payable to me and sent once a month by the KCHA to my attention at my home. The amount of that check would represent the combined monthly contributions from the KCHA for all of the Properties subject to Section 8 housing.

18. From approximately 2007 until approximately October 2022, I would receive the monthly Section 8 housing checks from the KCHA and deposit them into the Bank Account at the Bank.

19. Beginning in or around late 2021, the monthly check I received from the KCHA included KCHA's contribution to a Section 8 property located at 447 North Birch in Manteno, Illinois. This property is owned by my daughter, Sophia Malzone, and is not owned (and has never been owned) by the Partnership.

20. As a result, when I deposited KCHA monthly checks into the Bank Account, I would request cash back from that deposit equal to the amount of KCHA's contribution for the 447 North Birch property owned by my daughter.

21. In addition, from time to time, after Dickstein's car dealership stopped advancing payment for Partnership expenses as discussed in paragraphs 31-35 below, I would

4

necessarily need cash to pay for various expenses relating to the operation and management of the Properties including to pay for the cost of repairs for some of the Properties. Rather than withdrawing cash from the Bank Account, I would on occasion request cash back when depositing one of the KCHA checks, and I would use that cash to pay for various expenses relating to the operation and management of the Properties such as the cost of repairs.

22. Prior to hiring Wesley and filing the Complaint, Dickstein never inquired about what he later deemed to be allegedly improper withdrawals.

23. In or around October 2022, I stopped receiving any checks from the KCHA. I reached out to the KCHA to inquire as to why I was no longer receiving the KCHA checks, and I was told by Lynette DeRose that Dickstein was now receiving the checks from the KCHA.

24. Also, in or around October 2022, the KCHA began to separate the payment for my daughter's property from the rest of the Section 8 subsidy payments being made by KCHA for the Properties. When that occurred, I would only receive a check from the KCHA representing only the KCHA's portion of the rental payment for my daughter's property.

25. The Section 8 checks from the KCHA were never made payable to the "Partnership" because the Bank Account was not held in the name of the Partnership. Rather, Dickstein and I were the named account holders for the Bank Account.

26. Also, in or around October 2022, the Bank abruptly refused to provide me with receipts evidencing the rent deposits being made by the tenants of the Properties into the

Bank Account. The Bank also refused to provide me with receipts for the rent payments given to me by tenants that I was depositing into the Bank Account. Historically, the Bank would provide me with such receipts so that I could accurately keep a record of the rental payments being made by the tenants of the Properties.

27. Still further, at this same time, the Bank stopped honoring checks written by me on the Bank Account in favor of third-party vendors. It is my belief and understanding that the Bank's refusal to provide me with receipts and refusal to honor checks was a result of information that Dickstein allegedly provided to the Bank.

28. With regard to the January 27, 2023 letter allegedly written by Ms. Stapleton (attached as Exhibit F to the Dickstein Declaration), that letter contains many false and misleading statements. Ms. Stapleton began renting her property on or about October 1, 2022, which was the same time that the Bank began refusing to provide me with receipts for rental deposits. Without the ability to obtain the necessary receipts, I could no longer deposit rental payments into the Bank Account.

29. At that point, my only other option as the manager of the Properties was to request payment of rent in cash, and maintain a proper accounting of the rents I received in cash and how I used that cash, if necessary, for the operation and management of the Properties including to pay for the cost of necessary repairs.

30. Receiving a small number of rental payments in cash, and accounting for the same, was the only option short of turning over the operation and management of the Properties to Wesley Realty Group, a third-party property manager that I never agreed to manage any property belonging to the Partnership.

6

31. While my designated role in the Partnership was to be the "Property Manager," Dickstein's role was limited to providing the capital necessary for the Partnership to acquire and maintain the Properties. To the extent that the incoming rental payments were insufficient to cover expenses relating to the operation and management of the Properties, Dickstein's responsibility also was to provide the necessary funds to cover any such shortfalls.

32. From 2007 until approximately December 2020, Dickstein had an ownership interest in the David Bruce Auto Center, Inc. (the "Auto Center"), a car dealership located in Bourbonnais, Illinois. The other principal owner of the Auto Center was Bill Kelly.

33. I was an employee of the Auto Center beginning prior to 2007 through September 2021. I met Dickstein when I was working at the Auto Center, and we decided to form the Partnership together in 2007.

34. From 2007 until approximately December 2020, expenses related to the operation and management of the Partnership were paid with funds from the Auto Center. More specifically, I received an Auto Center credit card in my name that I used to charge expenses related to the operation and management of the Properties. The Auto Center would pay that credit card bill. In addition, Rhonda Thomas (an employee of the Auto Center) would write checks issued from an Auto Center checking account to various vendors and other third parties who I hired or were used to perform repairs to the Properties and to maintain the Properties. Checks were also written by the Auto Center to cover various county tax bills assessed against the Properties.

35. The Auto Center never requested any reimbursement from me for any of the

expenses that the Auto Center paid in connection with the operation and management of the Properties or in connection with the operation and management of the Partnership.

36. In approximately December 2020, Dickstein sold its ownership interest in the Auto Center. Following Dickstein's sale of his ownership interest in the Auto Center, the Auto Center ceased paying any expenses associated with the operation and management of the Properties and/or associated with the operation and management of the Partnership.

37. In addition, from the time that we started the Partnership in 2007 through December 2020, I am not aware of Dickstein using his personal funds to pay for any of the expenses associated with the operation and management of the Properties and/or the expenses associated with the operation and management of the Partnership. Rather, the Auto Center was directly paying all of those expenses during that time period. I was never provided any information as to whether Dickstein reimbursed the Auto Center for any portion of the amounts paid by the Auto Center for expenses associated with the operation and management of the Properties and/or expenses associated with the operation and management of the Partnership.

38. To best of my personal knowledge, information and belief, Dickstein did not use his personal funds to pay for any expenses associated with the operation and management of the Properties and/or expenses associated with the operation and management of the Partnership during 2021 or the first six months of 2022.

39. From 2006 until approximately September 2021, I worked as a Sales Manager and/or a Salesman for the Auto Center. After Dickstein sold his interest in the Auto Center in or around December 2020, I continued to work at the Auto Center, but I no

longer had the ability to use an Auto Center credit card to pay for expenses relating to operation and management of the Properties.

40.  From the inception of the Partnership in 2007 until September 15, 2022 – a period covering more than fifteen (15) years, Dickstein never requested that I make any type of capital contribution to the Partnership. During that same time period, Dickstein never requested that I use my personal funds to cover any of the expenses arising out of the operation and management of the Properties. During that same time period, Dickstein never requested that I use my personal funds to cover any "shortfalls" that existed in the Bank Account or otherwise use my personal funds to pay any monies that might have been owing to the Bank pursuant to the Loan.

41.  The reason that Dickstein never made any such requests is that he and I agreed at the outset that I would be responsible for operating and managing the Properties, and he would be responsible for contributing any monies or capital necessary to operate the Partnership and cover any "shortfalls" that may occur from time to time. Dickstein never requested a capital contribution from me prior to mid-September 2022.

42.  On or about February 1, 2023, the Bank contacted me and offered to refinance the Loan in a manner that would reduce the monthly payments from approximately $34,000 to approximately $18,000. I agreed to the Bank's refinancing proposal, and my understanding is the Dickstein also agreed. Accordingly, the refinancing transaction closed on or about February 13, 2023.

43.  I was primarily responsible for operating and managing the Properties from January 2007 until the fall of 2022 when Dickstein, without my consent, hired Wesley

Realty Group to be the alleged new property manager. Prior to the summer/fall 2022, Dickstein never complained about how I was managing the Properties. I have never agreed to Wesley Realty Group acting as the property manager in any capacity for the Partnership.

44.    As far as the Wesley Realty Group is concerned, it has served five-day notices on numerous tenants who are *not* delinquent in their rent. Through my counsel, I have provided Wesley Realty with accurate information and requested that they rescind the five-day notices improperly served upon a number of tenants. However, Wesley Realty has refused to rescind those improper five-day notices.

I declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing statements are true and correct with the sole exception of those statements that are qualified to be upon my knowledge, information and belief.

FURTHER AFFIANT SAYETH NOT

Date: February 23, 2023

_____
Anthony D. Malzone